UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:   Eric D. Biegler and Julia A. Biegler, | Case No. 95-63615 |
| | Chapter 7 |
| Debtors. | |

| | |
|---|---|
| Julia A. Biegler, | |
| Plaintiff, | Adv. Proc. No. 15-80005 |
| v. | |
| Educational Credit Management Corporation, | |
| Defendant. | |

Appearances:

James F. Selbach                          *for Plaintiff*
Selbach Law Firm, PLLC
290 Elwood Davis Road, Suite 290
Liverpool, NY 13088

William S. Nolan and Emily Perks Quinlan          *for Defendant*
Whiteman Osterman & Hanna, LLP
One Commercial Plaza
Albany, NY 12260

**Memorandum-Decision and Order**

This bankruptcy case was reopened to allow Plaintiff/Debtor Julia A. Biegler to bring this

adversary proceeding which seeks a declaration of dischargeability of her student loans pursuant

to the 1995 version of 11 U.S.C. § 523(a)(8)(A) that was in effect at the time the bankruptcy case

was filed.[1]  Educational Credit Management Corporation ("ECMC") answered, asserting that the

---

[1] In pertinent part, the statute provided:
  (a) A discharge under section 727…of this title does not discharge an individual from any debt—
       (8) for an educational benefit overpayment or loan made, insured or guaranteed by a
       governmental unit, or made under any program funded in whole or in part by a
       governmental unit or nonprofit institution, or for any obligation to repay funds received as
       an educational benefit, scholarship or stipend, unless—

Debtor's loans were nondischargeable. Following discovery, Plaintiff moved for summary judgment, which was denied.[2] On March 23, 2018, the court held a trial to determine whether Debtor's loans-which include eight Stafford Loans and three Auxiliary Loans to Assist Students ("ALAS" or "Auxiliary Loans")-were in repayment for seven years or longer, exclusive of any grace periods, deferments, or forbearances.[3] The matter is now before the court for decision.[4] For the reasons that follow, the court finds that Debtor's Stafford loans were in repayment for less than seven years and are nondischargeable, but Debtor's Auxiliary Loans were in repayment for more than seven years and have been discharged.

### Jurisdiction

The court has jurisdiction to hear and decide this core proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and. This memorandum-decision and order incorporates the court's

---

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition;

11 U.S.C.A. § 523(a)(8)(A) (West) (effective until April 25, 1996) (hereinafter referred to as "§ 523(a)(8)(A)").

[2] See Memorandum-Decision and Order dated August 8, 2017 at Doc. 60.

[3] The Higher Education Act reauthorization passed by Congress in 1986 shifted outstanding ALAS loans into a new program, Supplemental Loans for Students ("SLS"). See 99 P.L. 498, 100 Stat. 1384. Three of Debtor's loans spanned both programs.

[4] The evidentiary record includes two stipulations: Joint Stipulation of Facts dated November 5, 2017 (Doc. 74); Joint Stipulation of Facts dated March 6, 2018 (Doc. 91); the following Debtor's exhibits: Ten sets of promissory notes, contract terms, and transfer agreements (Ex. A), Debtor's Syracuse University Academic Transcript (Ex. B), Debtor's application to the Syracuse University for full-time certification for the Spring of 1987 (Ex. C); the following Defendant's exhibits: Federal Family Education Loan Program Student Certification Screen (Ex. 1), Debt Management Collection System ("DCMS") Claim Status Summary (Ex. 2), Preclaim Assistance Request by AFSA Data Corp. (Ex. 3), Memo prepared by AFSA Data Corp dated December 14, 1995 (Ex. 4), Borrower History and Activity Report for Stafford Loans (Ex. 6), Borrower History and Activity Report for Auxiliary Loans (Ex. 8), Letter to Debtor dated May 4, 1995 (Ex. 10) a. DMCS Transaction History Review (Ex. 11) and testimony by Ann Corbett, assistant registrar at Syracuse University, Debtor and Margaret Gonsowski, Esq., Senior Attorney with New York State Higher Education Services Corporation ("HESC").

findings of fact and conclusions of law as permitted by Fed. R. Bankr. P. 7052.

## Background History

Debtors Eric D. Biegler and Julia A. Biegler filed a joint chapter 7 petition on October 10, 1995. Their schedules listed certain educational loans taken out by the Plaintiff which have since been assigned to ECMC. Debtors received a discharge and the case was closed. Attempts to collect on the educational loans continued. Twenty years later, the case was reopened for the filing of this adversary proceeding in which Plaintiff seeks declaratory relief that the student loan debts at issue were encompassed by her discharge.

## Record Evidence of Undisputed and Disputed Facts

Debtor began a doctoral degree program at Syracuse University ("SU") in the fall of 1982. Doc. 91. To pay for her studies, Debtor incurred eleven student loans (the "Loans"), eight under the Stafford Loan program and three under the Auxiliary Loans to Assist Students program. Per Debtor's testimony and Defendant's records, the Loans were made by Onondaga Savings Bank ("Lender"), guaranteed by HESC ("Guarantor"), and serviced by several different servicers over time, including ACS and AFSA (interchangeably referred to as "Servicer").

Each time Debtor received a Stafford loan, she agreed to terms that required her to begin repayment nine months after (i) ceasing to be matriculated, (ii) withdrawing, or (iii) dropping below half-time status by carrying fewer than six credit hours in a semester.[5] Ex. A at 3, 6, 9, 12, 15, 18, 30. The terms of the April 1985 Auxiliary Loan provided that repayment of principal was deferred while Debtor attended school full-time. Ex. A at 20. The copies of contractual conditions entered into evidence for Debtor's two August 1985 Auxiliary loans are illegible. In the absence

---

[5] While in school, Debtor's loans are considered to be subject to a student deferral, granted as a matter of course, provided that minimum course-load requirements are met.

of evidence to the contrary, the court will infer that the terms for those two loans are substantially

the same as the April 1985 note, as all three notes were issued by the same institution within a two-

month period and no governing laws changed in the interim.  Ex. A at 24 and 27.

*Documents and Testimony Relied Upon by Debtor*

Debtor offers a transcript from the Syracuse University Registrar, which indicates that she

never dropped below half-time status through the summer semester of 1985. Ex. B.  Thereafter,

the transcript reflects that for the ensuing eleven years while Debtor pursued her Ph.D, she was

either not enrolled as a student, or was enrolled, but carried no credit hours.[6]  Ex. B.  In the single

spring semester of 1987, while Debtor worked on her Ph.D and carried zero credit hours, Debtor

requested and received full-time status in response to a form she submitted to her department.  By

then, according to Debtor, her nine-month grace period had already run and the Loans were in

repayment.  Ex. C.  On the basis of these records, Debtor contends that her student deferral

terminated at the conclusion of the 1985 summer semester and after a nine-month grace period, all

Loans entered repayment in May 1986.

Debtor testified that she received only two suspensions in payment: (i) her student

deferment through the summer of 1985 and (ii) a nine-month grace period, and that any other

deferments or forbearances after the loans entered repayment were never requested.  In further

support of her position, Debtor testified that she began making regular payments on her student

loans in May 1986 by check, paid in-person at branches of Onondaga Savings Bank or its

successor, OnBank, using coupons issued by the Lender.[7]  Per Debtor's testimony, her loans were

---

[6] , Debtor eventually earned her Ph.D in May 1996.

[7] Debtor has not presented any supporting documentation for these payments and testified that
records were no longer available, due to both the age of the records and subsequent mergers and
acquisitions of OnBank.

in repayment for seven years as of May 1993, with no suspensions of payment during that period. The following table summarizes Debtor's position.

| Debtor's Analysis of Repayment Status of Loans | | |
|---|---|---|
| August 13, 1986 | Debtor enrolled less than half-time. | |
| May 1, 1986 | Nine-month grace period ends. | |
| May 31, 1986 | Loans enter repayment. | |
| January 1, 1987 | Debtor's full-time enrollment status begins. | |
| May 31, 1987 | Debtor's full-time enrollment status ends. | |
| October 10, 1995 | Debtor declares bankruptcy. | |
| | *Days of applicable suspensions on filing date* | *0* |
| | *Total Years in Repayment on filing date* | *9.4* |
| | *Years in repayment less applicable suspensions on filing date* | *9.4* |

Debtor submitted as evidence copies of the ten promissory notes she signed, in addition to their terms and purchase agreements, and two applications for student aid bearing her signature. Ex. A. On those two applications, dated July 2, 1985 and July 8, 1985, Debtor indicated that she would be a full-time student for the next two semesters, from May 1985 through May 1986, and that she anticipated completing her program in May 1986. Ex. A at 23 and 25. That representation is contrary to the reality of Debtor's enrollment during that period, as she carried zero credit hours in Spring 1986. Debtor acknowledged that she completed the application forms, but neither offered testimony regarding any underlying circumstances nor did she explain her representation that she would remain at full-time status through May 1986.

*Documents and Testimony Relied Upon by Defendant*

Defendant relies upon various paper and electronic records of the Guarantor and Servicer as evidence that Debtor's loans could not have entered repayment any earlier than March 1988. There are some inconsistencies and missing information in these records which the court will address.

Defendant relies upon an HESC Certification Inquiry Record. "Ex. 1 ("HESC Certification"). It indicates that Syracuse University reported Debtor at less than half-time status as of May 31, 1986, that she was full-time again as of January 1, 1987, and that she was less than half-time again effective May 31, 1987.[8]  Ex. 1.  Per the credible testimony of Margaret Gonsowski, Esq., an in-house attorney at HESC, since Debtor's first period of dropping to less than half-time status lasted fewer than nine months, Debtor was entitled to another nine month grace period running from May 1987 through February 1988.[9]

Defendants placed in evidence a detailed history of communications and actions concerning Debtor's Stafford loans ("Stafford Account History").  This record was created by Servicer, and covers the period from May 1988 to July 1993. Ex. 6. The Stafford Account History makes clear that Servicer believed Debtor to be enrolled half-time or greater through May 1, 1988 and that her grace period ended on February 28, 1989. Ex. 6 at 41.  Servicer's actions are consistent with that belief—Servicer sent Debtor an initial disclosure statement on November 30, 1988, which reflected that (i) no payments had been made at that time and (ii) the first payment on the loan was due on March 28, 1989.  This evidence suggests that the seven-year repayment period ran through March 1995 exclusive of deferments, a full year later than the date suggested by the HESC Certification at Ex. 1. Ex. 6 at 44. The Stafford Account History also reflects a partially

---

[8] This record is consistent with Debtor's testimony that she had full-time status in the spring semester of 1987.

[9] The statutes and regulations applicable to Debtor's student loans state that loans do not enter repayment until a grace period has fully elapsed.  The Federal Student Financial Aid Handbooks for 1985-1987 and 1987-1988, published by the U.S. Dept. of Education, Office of Student Financial Assistance, clarify the treatment of brief unenrolled periods: "If a student returns to school at least half-time before the grace period ends, he or she may again postpone loan repayment while in school and will be entitled to a full grace period upon termination of enrollment or when dropping below half-time status." See the Federal Student Financial Aid Handbook for 1985-1987 available at https://hdl.handle.net/2027/uiug.30112075686938) and Federal Student Financial Aid Handbook for 1987-1988 available at https://hdl.handle.net/2027/uiug.30112075686920.

retroactive ten-month forbearance, granted June 9, 1992. Ex. 6 at 51. It indicates that on numerous occasions, Debtor or her spouse conveyed to Servicer that Debtor desired an unemployment deferral or represented that unemployment deferral forms were in the mail, but does not indicate that any such forms were ever received or deferrals granted by Servicer. *Id.*

Defendant's records also detailed the history of communications and actions concerning Debtor's Auxiliary loans ("Auxiliary Account History"), extending from March 1988 to July 1993. Compared to the record of the Stafford Loans, however, the Auxiliary Account History is incomplete and contradictory, as it appears that loan-related events occurred before the start of the records. The first recorded action by Servicer is an account statement sent to Debtor on March 31, 1988, but on April 27, 1988, a payment was credited to March 11, which strongly suggests that the account was in repayment prior to the first entry in the record. Ex. 8 at 30. Furthermore, at the time of the earliest recorded payment, the account balance was $5,417.78, which is $575.22 less than the amount originally disbursed, with no explanation in the record for the discrepancy.[10] The account cover page lists Debtor as ending her student deferment on August 13, 1985, and her first monthly payment as due on September 28, 1985. Ex. 8 at 27. However, a July 29, 1988 entry shows that those dates were not the ones originally associated with Debtor's account—Servicer retroactively changed Debtor's separation date from May 1, 1988 to August 13, 1985, while simultaneously granting a 32-month student deferment from September 1, 1985 to May 1, 1988, based on information from "other," an unknown source. *Id.* The Auxiliary Account History is consonant with the Stafford Account History for later events. This includes partially retroactive ten-month forbearance and requests and representations regarding unemployment deferrals.

---

[10] Early in the repayment period of an interest-bearing loan, payments are directed towards interest, rather than principal. Therefore, payments totaling substantially more than $575.22 would have been credited to the account to result in that decrease in principal.

Defendant offers two communications from AFSA Data Corporation and OnBank to HESC as supporting evidence of deferments/forbearance. The first is a March 26, 1992 pre-claim assistance request form for Debtor's Auxiliary Loans which records a 32-month deferment/forbearance on those loans from September 1, 1985 to May 1, 1988. Ex. 3. The second is a letter prepared at the time of Debtor's bankruptcy filing, indicating that Debtor received a 32-month Student Deferment from September 1985 to May 1988, and a forbearance from February 1992 to October 1992. That letter does not state whether these deferments refer to Auxiliary Loans, Stafford Loans, or both. Ex. 4. However, as both of these documents were prepared based upon the Auxiliary and Stafford Account Histories presented in Exhibit 8, the court does not consider them to be meaningfully corroborative or primary evidence. They simply reiterate the retroactive 32-month Auxiliary Loan student deferment and the 10-month Stafford and Auxiliary deferments which are listed in the records that would have been referenced by Servicer at the time they were prepared.

Margaret Gonsowski, Esq., an attorney for HESC, testified that Syracuse University's financial aid office reports to HESC, which then shares that information with the companies who service and issue student loans. Therefore, the Servicer and Guarantor records reflect enrollment information received from the Syracuse University financial aid office, and the court can reasonably infer what those records indicate, even though no records from that office are in evidence. Ms. Gonsowski further emphasized that Guarantors rely in good faith on the financial aid office and do not verify students' enrollment status with the separate office of the university registrar.

Defendant offers only one record from the period after Debtor's loan was transferred to Guarantor—correspondence from May 1995 that indicates Debtor requested and was granted a reduction in payment extending from May 2, 1995 to January 2, 1996. Ex. 10.

A table summarizing Defendant's position is presented below.

| Defendant's Analysis of the Repayment Status of Loans | | |
|---|---|---|
| May 31, 1986 | Expected graduation date as represented by Debtor. A nine-month grace period begins. | |
| January 1, 1987 | Debtor regains full-time status within seven months of entering grace period. | |
| May 31, 1987 | Debtor's full-time status ends and a nine-month grace period begins. | |
| February 1, 1988 | nine-month grace period ends. | |
| February 28, 1988 | Loans enter repayment. | |
| February 28, 1992 | Retroactive forbearance begins begins. | |
| June 9, 1992 | Partially retroactive forbearance granted, from February 28, 1992 to October 28, 1992. | |
| October 28, 1992 | Forbearance ends. | |
| May 2, 1995 | Temporary payment reduction granted, extending through June 2, 1996. | |
| October 10, 1995 | Debtor declares bankruptcy. | |
| | *Days of applicable suspensions on filing date* | *404* |
| | *Total Years in Repayment on filing date* | *7.6* |
| | *Years in repayment less applicable suspensions on filing date* | *6.5* |

**Discussion**

At the time Debtor's bankruptcy proceeding was filed, 11 U.S.C. § 523(a)(8)(A) provided for the discharge of student loans that, at the time of the filing of the bankruptcy, had been in repayment for more than seven years, exclusive of any applicable suspensions. § 523(a)(8)(A). Several circuits have addressed the question of whether to start tolling the seven-year period from the due date of the first payment or the end of a debtor's student deferments/grace period, and they concur that the date the first payment is due is appropriate. *In re Nunn*, 788 F.2d 617, 618 (9th Cir. 1986), *In re Scott*, 147 F.3d 788, 790 (8th Cir. 1998), *In re Woodcock*, 45 F.3d 363, 365 (10th Cir. 1995). The court adopts this approach.

In situations where a loan did not enter repayment even though it should have by its terms, courts have applied equitable principles to select a start to the repayment period not necessarily

9

consistent with the reality of the borrower's enrollment. Notably, bankruptcy courts have regularly treated in-school deferments granted on the basis of borrowers' misrepresentations as the start of the repayment period, even though by their terms, the borrowers' loans should have entered repayment on an earlier date. *In re Huber*, 169 B.R. 82, 87 (Bankr. W.D.N.Y. 1994)(holding that plaintiff's in-school-deferments to which he was not entitled as a matter of law were nonetheless applicable suspensions of payment for the purpose of dischargeability); *In re Kaufman*, 9 B.R. 755, 758 (Bankr. E.D. Pa. 1981)(holding that plaintiff's misrepresentation of his expected graduation prevented him from claiming an earlier completion of studies for dischargeability purposes); *In re Woodcock*, 212 B.R. 658, 661 (D. Colo. 1997), aff'd, 144 F.3d 1340 (10th Cir. 1998)(holding that a debtor's requested in-school-deferments to which he was not entitled are subtracted from the repayment period of his loans for dischargeability purposes). The primary rationale behind this delayed tolling is a recognition that "lender and guarantor, in turn, have a right to rely upon the dates of anticipated graduation set forth in the loan agreement." *New York State Higher Educ. Svcs. Corp. v. Lucianna*, 666 A.2d 173, 175–76 (N.J. Super. App. Div. 1995). The court adopts this reasoning and will not consider a loan to be in repayment during any period where a lender abstains from debt collection based on a borrower's incorrect representation of their continued enrollment or graduation date.

From the seven-year period, "any applicable suspension of the repayment period" is excluded. A "period (by agreement, by court order, by operation of law, etc.) during which the debtor is not obliged to make payments" facially qualifies as an applicable suspension. *In re Huber*, 169 B.R. 82, 84 (Bankr. W.D.N.Y. 1994). Beyond deferments and forbearance, which totally halt payment obligations, bankruptcy courts have held that an applicable suspension can include a reduction or modification of payments. *In re Shryock*, 102 B.R. 217, 219 (Bankr. D.

10

Kan. 1989), *Matter of Eckles*, 52 B.R. 433, 434 (E.D. Wis. 1985). However, bankruptcy courts

have found that neither suspensions granted unilaterally by the lender nor retroactive suspensions

during which a lender did not forego any rights qualify as applicable suspensions. *See In re*

*Crumley*, 21 B.R. 170 (Bankr. E.D. Tenn. 1982)(holding that a lender may not extend the

repayment period by granting unsolicited suspensions of payment), *See In re Brinzer*, 45 B.R. 831

(S.D.W.Va.1984)(holding that a lender has no unilateral right to suspend repayment); *See In re*

*Keenan*, 53 B.R. 913, 917 (Bankr. D. Conn. 1985)(holding that an unrequested deferment was

invalid); *In re Flynn*, 190 B.R. 139, 142 (Bankr. D.N.H. 1995)(holding that a lender's retroactive

forbearance was inapplicable, as it merely recognized a previous period of nonpayment during

which the lender did not forego any rights); *In re Manriquez*, 207 B.R. 890, 893 (Bankr. App. 9th

Cir. 1996)(holding that where the seven-year period of § 523(a)(8) has completely expired before

execution of a forbearance agreement, that agreement does not qualify as an applicable

suspension.) Applying the foregoing rationale, the court will consider both suspensions of payment

obligations and reductions in payment to be applicable suspensions, as long as they were

responsive to Debtor requests and, if retroactive, included a substantial forbearance on the part of

the lender.

Dischargeability proceedings are governed by the preponderance of the evidence standard,

*Grogan v. Garner*, 498 U.S. 279 (1991), but the burden of proof shifts between the parties. "The

separate allocation of burdens, one to the debtor and the other to the Defendant is consistent with

the legislative history of § 523(a)(8) which indicates that the '... provision is intended to be self-

executing and the lender or institution is not required to file a complaint to determine the

nondischargeability of any student loan.'" *Matter of Coleman*, 98 B.R. 443, 447 (Bankr. S.D. Ind.

1989) (quoting S. Rep. No. 989, 95th Cong. 2d Sess. 79 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5865).

Regardless of who bears the ultimate burden of demonstrating the repayment status of the Loans, the facts which the court has found lead to the inevitable conclusion as to which loans under the applicable statute have been discharged.

### *Date upon which Debtor's Stafford Loans Entered Repayment Status*

While a student is enrolled in an eligible institution on at least a half-time-basis, she is eligible for in-school deferments on her Stafford Loans. Then, when the student ceases to be enrolled on at least a half-time basis, her Stafford Loans enter a nine-month grace period, after which the loans enter repayment. 34 C.F.R. § 682.102, 34 C.F.R. §§ 682.209(a)(2)(ii-iii). That regulatory grace period is consistent with the terms of Debtor's loans, where she agreed to begin repayment at "the end of the ninth month following the month in which she cease[d] to be matriculated, withdr[ew] from, or bec[ame] less than a half-time student at an approved school (6 semester hours)." Ex. A at 3 and 6; see also Ex. A at 9, 11, 14, 18, 30 (stating substantially identical contract terms).

On the basis of her actual course-load and the registrar's records, Debtor contends that her Stafford Loans entered repayment in May of 1986, nine months after her last semester carrying six or more credits concluded in August 1985. Ex. B. The court finds this evidence of Debtor's actual enrollment to be credible. Debtor testified that she received loan payment information and began making payments in May of 1986. Although it is 32 years later, and Debtor's only evidence is her relatively non-specific oral testimony, the court credits Debtor's testimony as to her recollection that she made some student loan payments during that period. However, without further

supporting evidence, the court cannot find that those payments applied to both her Auxiliary Loans
and her Stafford Loans, which would have entered repayment status on different dates, as
discussed below.  A close examination of Defendant's records reveals no support for the
proposition that payments Debtor made from May 1986 onward were on her Stafford Loans.  This
position is plainly contrary to both Defendant's records and Debtor's own representations
regarding her expected graduation, which would have entitled her to at least a nine month grace
period following that date.

Defendant's records facially do not reflect Debtor's true enrollment history.  They show
that for Stafford Loan repayment purposes, Defendant treated Debtor as if she was a full-time
student through May 1988, despite knowledge to the contrary.[11]  Defendant has not offered
supporting evidence giving a basis for that misapprehension, so the court cannot credit the date
which is plainly at odds with Debtor's actual enrollment.  However, the evidence presents a basis
for Defendant to believe that Debtor would complete her studies in May 1986. On two student loan
applications, both completed in June of 1985, Debtor represented to the Syracuse University
financial aid office—and by extension her Lender and Guarantor—that her anticipated date of
program completion was May 1986 and that she would be enrolled full-time through that date. On
the basis of that representation, Debtor received a loan for the period from August 1985 through
May 1986, to which she would not have been entitled had she disclosed her true enrollment

---

[11] In February of 1988, the evidence indicates that Guarantor was aware that Debtor was enrolled
less-than half-time as of May of 1987, and had not returned to full-time status within 9 months,
and thus her loans should have entered repayment. Ex. 1.  No explanation has been offered for
why Defendant gave unmerited student deferments on Stafford Loans through May 1, 1988 and a
grace period extending through February 1989. Ex. 3, Ex. 4, Ex. 6.  In the absence of explanatory
evidence or testimony, the court will treat this extra year of student deferments as the lender's
error.

status.[12] Ex. A at 23 and 26. On the basis of that representation, Defendant argues that Debtor's

first Stafford Loan payment came due no earlier than the end of March 1988, nine months after

her represented graduation date.[13]

Though the court credits Debtor's testimony and her academic transcript as representing

the reality of Debtor's enrollment status, the court cannot disregard incorrect representations by

Debtor upon which her lenders relied for the purpose of scheduling her repayment. Defendant

argues that regardless of Debtor's actual enrollment status, the records of the financial aid office

should inform and sway the court's analysis. HESC records directly mirror Debtor's

representation, and thus show her as a full-time student through May 31, 1986. Ex. 1.

Furthermore, a Stafford Loan in the amount of $2,555 was disbursed on July 17, 1985 specifically

to cover Debtor's academic period through May 1986, which would not have been available to

Debtor had she appropriately informed her lender of her enrollment status. Ex. A at 26. Debtor

"cannot now claim that [s]he may benefit twice—once from the deferment and a second time by

discharge of the debts for age." *In re Huber*, 169 B.R. 82, 85 (Bankr. W.D.N.Y. 1994). Not only

would it run afoul of equitable principles to discard evidence of the Debtor's own

misrepresentation, but it would be "a virtual impossibility for banks engaged in making student

loans or for state agency guarantors to police the many thousands of borrowers to determine which

---

[12] The court recognizes the possibility that Debtor represented a graduation date of May 1988 in another document submitted to her lender or guarantor, which would form the basis for the lender's use of that date in their records, however, no supporting evidence of such representation is in evidence.

[13] If Debtor's full-time status extended to May of 1986, then her Stafford Loans were subject to grace periods and student deferments through February 28, 1988, as Debtor's Spring 1987 semester of administrative full-time status occurred before the end of her first nine-month grace period, and she was eligible for a second nine-month grace period after the semester ended.

14

students are still in school and which have withdrawn before graduation." [14] *New York State Higher*

*Educ. Services Corp. v. Lucianna*, 666 A.2d 173, 175 (N.J. Super. App. Div. 1995). Therefore,

the court will treat the May 31, 1986 date represented by Debtor and relied upon by her lenders as

the end of Debtor's full-time status. Debtor's first payment would have been due on the last day

of the month after the conclusion of the grace period and, therefore, the court finds that for the

narrow purpose of this dischargeability analysis, Debtor's Stafford Loans entered repayment status

on March 28, 1988, and absent applicable suspensions considered below, were in repayment for

7.6 years on the day Debtor filed for bankruptcy.

   *Date upon which Debtor's Auxiliary Loans Entered Repayment Status*

   Neither party has addressed the fact that Debtor's Auxiliary Loans are subject to different

payment terms than her Stafford Loans, and have instead erroneously treated the programs as

subject to the same temporal payment terms, not only in their arguments, but in their stipulations.[15]

Doc. 74, Doc. 91. However, when Debtor applied for the three Auxiliary loans in 1985, they were

---

[14] This issue was also addressed by the Department of Education in a 1992 response to public comments, with a conclusion that a loan guarantor such as Plaintiff can set the end date for a student deferment in reliance upon the anticipated graduation date represented on a certified loan application form. In the same response to public comment, the Department of Education also rejected a proposal to require that guarantors without computer systems check the status of students on an annual basis as too onerous. *Federal Family Education Loan Programs*, 57 FR 60280-01. Though those administrative decisions occurred seven years later than Debtor's representation, the court considers them as evidence that Plaintiff's reliance was reasonable and consistent with industry practices.

[15] Changes to the law which delayed repayment on SLS loans until the grace period ran on any existing Stafford Loans did not occur until 1992, when Congress passed the Higher Education Amendments of 1992, and the Department of Education promulgated rules in response, which have stood unchanged since. 34 C.F.R. § 682.102, 34 C.F.R. §§ 682.209(a)(2)(ii-iii), Higher Education Amendments of 1992, Enacted S. 1150, 102, Enacted S. 1150, 106 Stat. 448, 530, Federal Family Education Loan Programs, 57 FR 60280-01. Comments during the rulemaking process make it clear that this deferment was not available prior to the December 1992 final rule. Federal Family Education Loan Programs, 59 FR 33334-01.

under the ALAS program, created by Congress through the 1981 Budget Reconciliation Act. 97

P.L. 35, 95 Stat. 455. At that time, loans backed by the federal government had to provide:

> that periodic installments of principal need not be paid, but interest shall accrue and
> be paid, during any period—(i) during which the borrower (I) is pursuing a full-time
> course of study at an eligible institution, [or] (II) is pursuing at least a half-time course
> of study (as determined by such institution) during an enrollment period for which
> the student has obtained a loan under this part...

20 U.S.C. § 1077(a)(2)(C) (1981).[16] There was no mention of a grace period in that statute.

The terms of Debtor's April 1985 ALAS/SLS loan are consistent with this law—Debtor agreed

that "repayment of principal [was] deferred while [she] pursu[ed] a full-time course of study at an

approved school," and that a deferment was available "during any period in which [debtor was]

pursuing a full-time course of study at an approved school. Ex. A at 20-21. Further, she agreed to

"immediately provide written notification to the lender or subsequent holder of [the] promissory

note when [she was] no longer pursuing a full-time course of study in an approved school." *Id* at

20.

    As discussed previously, the court will treat Debtor's representation on her loan documents

that she was a full-time student through May 1986 as fixing the end of her full-time status, and

thus the end of her Auxiliary Loan student deferments. Her first payment would therefore come

due on June 30, the month following termination of full-time status. Debtor's testimony that she

received coupon books in May 1986 and began making payments is consistent with this finding,

and the court credits Debtor's testimony that some payments were made, but concludes that she is

describing payments only on her Auxiliary Loans. This finding is further consistent with the fact

that the starting principal balance on Debtor's Auxiliary Loans in 1988 was $575.22 less than the

total of her Auxiliary Loan disbursements, and that Debtor's payment record includes an April 27,

---

[16] This section remained unchanged through at least 1988. 20 U.S.C. § 1077(a)(2)(C) (1988).

1988 payment, ahead of the May 1, 1988 separation date then associated with the loans. Ex. 8.
The evidence does not include details of these payments, but the court accepts Debtor's testimony
that some payments were made.

The court has closely examined ACS's records which ostensibly show that Debtor was
granted a student deferment for her Auxiliary Loans extending three years past the end of her full-
time status, through May 1, 1988. The basis for ACS's belief that Debtor was enrolled full-time
through May 1998 is unclear. The court concludes, however, that even if there was a deferment, it
is more likely than not that the deferment did not cover the entirety of the period.[17] Therefore, the
court finds that for the purposes of dischargeability, Debtor's Auxiliary Loans repayment period
began on May 31, 1986, and, absent applicable suspensions discussed below, were in repayment
for 9.4 years on the day Debtor filed for bankruptcy.

*Suspensions of Payment or Reductions in payment on SLS and Stafford Loans*

Debtor testified that she neither received nor requested any forbearance or deferments on
payment of her loans, but the court does not credit this blanket assertion. On the basis of ACS
records which indicate "unemployed deferment form sent" as the outcome of three calls received
or made by Debtor and her spouse in February of 1993, the court concludes that Debtor requested

---

[17] For a considerable period, ACS's record indicated May 1, 1988 as Debtor's "separation date,"
another term for the end of her full-time status. Ex. 8 at 30. Then, on July 29, 1988, Debtor's
Auxiliary Loan account records were modified "based on information certified on [March 1, 1988]
by "other", and Debtor was retroactively granted a student deferment from September 1, 1985 to
May 1, 1988, a period of 973 days. This deferment is referenced in Exhibit 3, a 1992 preclaim
assistance form submitted by AFSA to HESC, and in Exhibit 4, a letter prepared by AFSA Data
Corp at the time of Debtor's bankruptcy. However, as both of these documents were prepared
based upon the computerized record presented in Exhibit 8, the court does not consider them to be
meaningfully corroborative or primary evidence. The reason for this retroactive change is unclear
from ACS records, and it was not addressed in testimony, but the court infers that in March of
1988, the ACS learned that its records were wrong regarding Debtor's full-time status, and made
a responsive change to their records which reflected the proper separation date, but did not alter
Debtor's repayment obligations with regard to the date of the first payment.

an unemployment deferment. Ex, 6 at 51, Ex. 8 at 38. Furthermore, on the basis of ACS records

which indicate "unemployment deferment in mail to ACS" following four phone calls with debtor

or her spouse, the court concludes that Debtor further affirmed her desire for a deferment by

representing, truthfully or not, that she had prepared and sent the requisite paperwork. Ex. 6 at 52-

53, Ex. 8 at 39-40. Based on this evidence and as further discussed below, the court gives no

weight to Debtor's testimony in this regard.

As discussed previously, the court does not find Defendant's records persuasive to support

a finding that Debtor's Auxiliary Loan student deferment extended for 32 months through May 1,

1988, as that date is inconsistent with the records of the Syracuse University registrar's office, and

the Auxiliary Loan History is facially incomplete. Instead, the court finds that a student deferment

through May 1, 1986 was granted on the basis of Debtor's representation regarding her full-time

status and expected graduation date. No evidence has been presented that Debtor requested a

suspension for an additional two years beyond that date. Rather, the court finds that Debtor made

some payments towards her Auxiliary Loans during that period. Therefore, the court does not find

that a 32-month student deferment existed, as implied by the Auxiliary Loan History, but rather

that the beginning of the repayment period for Auxiliary Loans was May 31, 1986.

Both the Auxiliary and Stafford Account Histories indicate that Debtor was granted a

forbearance for both her Auxiliary Loans and Stafford Loans on June 9, 1992, for a period of 243

days, extending from February 28, 1992 to October 28, 1992.[18] Ex. 6 at 51. Ex. 8 at 38. The court

finds that this is credible evidence that a forbearance occurred. Eighteen days earlier, notes from

---

[18] This deferment is referenced in Exhibit 3, a 1992 preclaim assistance form submitted by AFSA
to HESC, however, as that document was prepared based upon the computerized records presented
in Exhibits 6 and 8, the court does not consider it to be meaningful corroborating evidence.

a call Debtor made to ACS read "Phone call from borrower at 12:06 PM, disputes loan amount, action pending, cap forbearance sent." *Id.* The court interprets this note to indicate that forbearance was requested on that call. The court shall consider this forbearance in two parts, an ordinary forbearance for 141 days, and a retroactive forbearance for 102 days.

For the 141-day period from the granting of forbearance through expiration of forbearance, Debtor was under no obligation to make payments toward her student loan debt. She made no payments, and received no collection calls from her lender. Ex. 6 at 51, Ex. 8 at 38. Debtor has introduced no contradictory evidence beyond her self-serving blanket denial of having received any forbearances, which the court does not credit. The court finds that this suspension actually occurred, and that it was requested by the Debtor. Therefore, a 141 day applicable suspension must be subtracted from the time in which both the Auxiliary loans and the Stafford Loans were in repayment.

For the retroactive 102 day period of this deferment, the court looks to *In re Flynn*, 190 B.R. 139, 142 (Bankr. D.N.H. 1995), and asks whether the lender exercised any forbearance activities such as waiving interest or foregoing any other rights under the original loan documents during that period, or whether the retroactive forbearance merely served to extend the seven-year repayment period. Debtor's repayment obligation was not suspended during this retroactive period and, in fact, she made the equivalent of four monthly payments toward both her Auxiliary Loans and her Stafford Loans. The lender continued collection efforts during the period, including constant phone calls and correspondence, and interest continued to accrue on Debtor's account. Therefore, because Servicer did not forego any substantive rights, the court will not recognize this retroactive period of forbearance as valid for the purpose of exclusion from the seven-year period under 523(a)(8)(A).

Letters entered into evidence show that Debtor was temporarily granted a reduction in payment amount extending from May 2, 1995 to January 2, 1996, a period of 310 days, 161 of which had elapsed on the date of the bankruptcy filing.[19] Ex. 10. The letters specifically state that the deferral was in response to Debtor's request. Ex. 10 at 2. Debtor has offered no contrary evidence, beyond her self-serving testimony, that this reduction did not occur. The court credits Defendant's evidence and concludes that this reduction in payment (i) occurred, (ii) was granted in response to Debtor's request, and (iii) was not retroactive. Therefore, to reflect this reduction in payment, 161 days must be subtracted from time in which both the Auxiliary loans and the Stafford Loans were in repayment to reflect this reduction in payment.

A table summarizing the court's findings follows.

| Court's Findings Regarding Repayment Status of Loans | | |
|---|---|---|
| May 31, 1986 | Expected graduation date as represented by Debtor. Stafford Loans enter a nine-month a grace period. | |
| June 30, 1986 | Auxiliary Loans enter repayment. | |
| January 1, 1987 | Debtor regains full-time status seven months into Stafford Loan grace period. | |
| May 31, 1987 | Debtor's full-time status ends and nine-month Stafford Loan grace period begins. | |
| February 1, 1988 | Nine-month Stafford Loan grace period ends. | |
| February 28, 1988 | Stafford Loans enter repayment | |
| June 9, 1992 | Substantive forbearance begins for both Stafford and Auxiliary Loans. | |
| October 28, 1992 | Substantive forbearance ends for both Stafford and Auxiliary Loans. | |
| May 2, 1995 | Temporary payment reduction granted, extending through June 2, 1996. | |
| October 10, 1995 | Debtor declares bankruptcy. | |
| | *Stafford Loans* | *Auxiliary Loans* |
| *Days of applicable suspensions on filing date* | *302* | *302* |
| *Total Years in Repayment on filing date* | *7.6* | *9.4* |
| *Years in repayment less Applicable Suspensions on filing date* | *6.8* | *8.4* |
| *Date Loans were in repayment status for seven years* | *Aug. 19, 1996* | *Nov. 19, 1993* |

---

[19] The court finds that at the time Debtor was granted this forbearance, the loan was still within seven years of entering repayment, as a 141-day forbearance was previously granted.

Considering the forbearance and reduction in payment discussed above, on the date of

Debtor's bankruptcy filing, her Auxiliary Loans had been in repayment for 8.4 years, and her

Stafford Loans had been in repayment for 6.8 years.


## **CONCLUSION**

On the basis of the evidence presented, the court finds Debtor's Auxiliary Loans were

discharged under the then-applicable § 523(a)(8)(A) exception and Debtor's Stafford Loans were

not discharged.


So Ordered.

Dated:  June 8, 2018               _____
        Syracuse, New York         Margaret Cangilos-Ruiz
                                    United States Bankruptcy Judge